UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDIA VIOLA BAKER,<br><br>                              Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner Of Social Security,<br><br>                              Defendant. | Case No.:  16-cv-01048-CAB (JMA)<br><br>**REPORT AND<br>RECOMMENDATION OF<br>UNITED STATES MAGISTRATE<br>JUDGE** |

Plaintiff India Viola Baker ("Plaintiff") seeks judicial review of Defendant

Social Security Acting Commissioner Carolyn W. Colvin's ("Defendant")

determination that she is not entitled to supplemental security income ("SSI")

benefits.  The parties have filed cross-motions for summary judgment.  For the

reasons set forth below, the Court recommends Plaintiff's motion for summary

judgment be **DENIED** and Defendant's cross-motion for summary judgment be

**GRANTED**.

I.    **BACKGROUND**

Plaintiff, who was born on August 21, 1990, was twenty-one years old

when she filed her applications for benefits. (Admin. R. at 211.)  She did not

complete high school, but obtained a General Educational Development ("GED")

degree.  (Id. at 83.)  She has held a few part-time jobs, each lasting for only a short period of time.  (Id. at 80-82.)  In an application for SSI protectively filed on May 25, 2012, Plaintiff alleged a disability onset date of May 25, 2012.  (Id. at 211.)  Plaintiff's application was denied initially on September 6, 2012, and upon reconsideration on December 6, 2012.  (Id. at 113-123, 124-134.)  On December 30, 2012, Plaintiff requested an administrative hearing.  (Id. at 148-150.)  A hearing was conducted on July 8, 2014 by Administrative Law Judge ("ALJ") Robert Iafe, who determined on September 26, 2014 that Plaintiff was not disabled.  (Id. at 37-44.)  Plaintiff requested a review of the ALJ's decision (Id. at 26). The Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on March 1, 2016.  (Id. at 1-4.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II.    MEDICAL EVIDENCE

### A.    Seagate Medical Group (2011)

On November 15, 2011, Dr. Gregory Nicholson performed a Comprehensive Psychiatric Evaluation of Plaintiff at the request of the Department of Social Security.  (Id. at 330.)  Dr. Nicholson reviewed Social Security Disability Report Form SSA-3368 and conducted a mental status examination.  (Id.)  Plaintiff reported she was bothered by hearing voices speaking when there was no one there, although she could not remember what the voices said.  (Id. at 330-31.)  She also reported feeling paranoid and fearful that someone would harm her.  (Id. at 331.)  Plaintiff informed Dr. Nicholson that she experienced insomnia, decreased appetite, trouble concentrating, and decreased interest in normal activities.  (Id.)  She told him she stopped working as a cashier due to shortness of breath.  (Id. at 331-32.)  Plaintiff also reported feeling suicidal in the past and said she had attempted suicide multiple times.  (Id. at 331.)  Plaintiff denied any history or symptoms related to mania or anxiety disorders, or any history of psychiatric hospitalizations.  (Id.) Plaintiff was not

seeing a psychiatrist at the time of the evaluation.  (Id.)

Plaintiff reported she dropped out of school in the 12th grade.  (Id.)  She denied any history of street drug use, problems related to drinking, or legal history.  (Id. at 331-32.)  Plaintiff also stated she did not have her own place to live and "stay[s] with anybody who will let [her]."  (Id. at 332.)  She indicated she did not cook and other people gave her food, but stated she did her own laundry, and had no difficulty with dressing, bathing, or hygiene.  (Id.)  She also indicated she did not drive because she did not have a license. (Id.)  She stated she could handle cash and get out on her own.  (Id.)

Dr. Nicholson's mental status examination consisted of observations in several different categories.  Dr. Nicholson first reported on Plaintiff's appearance, attitude and behavior, noting Plaintiff arrived neatly and casually groomed.  (Id.)  Plaintiff made good eye contact and good interpersonal contact and was generally cooperative.  (Id.)  Plaintiff volunteered information spontaneously with no psychomotor agitation or retardation.  (Id.)  Plaintiff appeared to be genuine and truthful and there was no evidence of exaggeration or manipulation.  (Id.)  Dr. Nicholson also noted that Plaintiff did not appear to be under the influence of drugs or alcohol.  (Id.)

Dr. Nicholson found Plaintiff's thought processes to be coherent and organized.  (Id.)  He remarked there was no tangentially or loosening of associations.  (Id.)  Plaintiff reported hallucinations and paranoia related to her thought content.  (Id.)  She denied plans to harm herself or others and did not appear to be responding to internal stimuli.  (Id. at 332-33.)  Plaintiff's mood was depressed and her affect was dysphoric, which Dr. Nicholson noted was appropriate and congruent with her thought content.  (Id. at 333.)  Plaintiff was not tearful.  (Id.)

Dr. Nicholson found Plaintiff's speech to be normal and clearly articulated.  (Id.)  He did not observe stammering, dysarthria, neologisms, tangentiality,

circumstantiality, or loosened, unusual or blocked associations.  (Id.)

Dr. Nicholson reported Plaintiff's intellectual functioning was alert and oriented to time, place, person, and purpose.  (Id.)  Plaintiff appeared to Dr. Nicholson to be of average intelligence.  (Id.)

Dr. Nicholson tested Plaintiff's memory and reported she was able to recall three items immediately, two out of three items after five minutes, and three out of three items with hints.  (Id.)  He administered a digit span test of six forward and three backward.  (Id.)  Dr. Nicholson noted Plaintiff's fund of knowledge was grossly intact and her insight and judgment appeared to be grossly intact.  (Id.)  Plaintiff was also asked to spell "world" to which she responded she had trouble with spelling.  (Id.)  She was able to perform a serial threes test and correctly stated 80 cents would be received from a dollar if two oranges were bought at 10 cents each.  (Id.)

Dr. Nicholson's diagnostic impression consisted of the following:

AXIS I:       1. Psychotic Disorder, not otherwise specified.
              2. Depressive Disorder, not otherwise specified.

AXIS II:      No diagnosis

AXIS III:     Deferred to the appropriate specialist.

AXIS IV:      Psychosocial stressors during the past year:  Financial stress.

AXIS V:       Current GAF:      55[1]

(Id. at 334.)

---

[1]  The Global Assessment of Functioning scale, or GAF scale, is a numeric scale (0 through 100) used by mental health practitioners to rate social, occupational, and psychological functioning, with lower numbers representing more severe symptoms, difficulties, or impairments.  The scale is presented in the Diagnostic and Statistical Manual of Mental Disorders.  A GAF score between 51 and 60 suggests moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text Revision (2013).

Dr. Nicholson reported his diagnosis of psychotic disorder was based on Plaintiff's history of hallucinations and paranoia. (Id.) The depressive disorder diagnosis was based on Plaintiff's history of depressed mood, dysphoric affect and neurovegetative symptoms of depression. (Id.) Dr. Nicholson opined Plaintiff's condition was expected to improve in the next twelve months with active treatment. (Id.)

Dr. Nicholson's functional assessment of Plaintiff included the following:

1. Plaintiff is able to understand, remember, and carry out simple one or two-step job instructions.

2. Plaintiff is able to do detailed and complex instructions.

3. Plaintiff's ability to relate and interact with coworkers and the public is mildly limited.

4. Plaintiff's ability to maintain concentration and attention, persistence and pace is mildly limited.

5. Plaintiff's ability to accept instructions from supervisors is not limited.

6. Plaintiff's ability to maintain regular attendance in the work place and perform work activities on a consistent basis is mildly limited.

7. Plaintiff's ability to perform work activities without special or additional supervision is not limited.

(Id. at 334-335.) Dr. Nicholson also reported Plaintiff was capable of handling funds. (Id. at 335.)

## B. **Seagate Medical Group** (2012)

On June 29, 2012, Plaintiff met with Dr. Douglas R. Dolnak, who performed a Comprehensive Psychiatric Evaluation at the request of the Department of Social Security. (Id. at 363-368.) Dr. Dolnak also reviewed Social Security Disability Report Form SSA-3368. (Id. at 363.)

/ /

Dr. Dolnak reported Plaintiff appeared to be a reliable historian.  (Id.)
Plaintiff informed him she applied for disability because of her chronic worry and
anxiety about finances, health, future and being homeless.  (Id.)  Plaintiff also
reported daily worry and frustration about her health and a history of irregular
heavy vaginal bleeding.  (Id.)  Plaintiff indicated she experienced daytime fatigue,
low energy, occasional insomnia and restless sleep.  (Id.)

Dr. Dolnak's mental examination consisted of his observations in several
different categories.  He first reported on Plaintiff's appearance, attitude and
behavior, noting Plaintiff arrived on time, casually dressed and in no acute
distress.  (Id. at 365.)  She ambulated well, sat in the chair comfortably, and was
pleasant, cooperative, and not agitated.  (Id.)  Dr. Dolnak noted her mood was
dysphoric with mild anxiety.  (Id.)  Her affect was constricted, not labile.  (Id.)

Dr. Dolnak also reported Plaintiff's thought content and processes were
clear and goal directed.  (Id.)  Dr. Dolnak reported feelings of helplessness and
frustration colored the interview.  (Id.)  Plaintiff reported nightmares and
occasional flashbacks related to prior trauma with occasional anticipatory
anxiety.  (Id.)  Plaintiff also reported she was easily startled.  (Id.)  Plaintiff denied
suicidal ideation with plan or intent, but did report homicidal ideation with plan or
intent.  (Id.)  Plaintiff reported occasional difficulties with attention and
concentration: she stated she gets distracted, forgets things around the house,
and misplaces objects.  (Id.)  Plaintiff reported her difficulties affected her two to
three days out of the week.  (Id.)  Plaintiff denied other severe symptoms for
mania, bipolar disorder or psychosis.  (Id.)  Dr. Dolnak reported Plaintiff did not
seem to be internally preoccupied.  (Id.)

Dr. Dolnak reported Plaintiff was alert and oriented to person, place, and
time; she did not know the date, but knew the month and year.  (Id. at 366.)  Dr.
Dolnak performed memory and cognition tests.  (Id.)  Plaintiff could recall three
items immediately, and two out of three items after five minutes.  (Id.)  Plaintiff

was able to perform serial sevens and serial twos from twenty to ten. (Id.)
Plaintiff could spell "world" forward but not backward. (Id.) Plaintiff could do
three digits backward and three digits forwards. (Id.) Dr. Dolnak reported
Plaintiff demonstrated mild difficulty with attention and concentration during the
interview. (Id.)

Plaintiff was able to state similarities between an apple and an orange and
between a coat and a shirt. (Id.) Plaintiff was not able to interpret the proverb,
"as plain as the nose on your face". (Id.) Dr. Dolnak reported Plaintiff's insight
and judgment appeared fair regarding the current situation. (Id.)

Dr. Dolnak's diagnostic impression consisted of the following:

AXIS I:     1. Depressive Disorder, not otherwise specified.
            2. Post-Traumatic Stress Disorder.

AXIS II:    None.

AXIS III:   History of dysfunction vaginal bleeding.

AXIS IV:    Psychosocial stressors during the past year:  Mild (chronic
            enduring circumstances), limited psychosocial support system
            and financial difficulty.

AXIS V:     Current GAF:     60

(Id. at 366.)

Dr. Dolnak opined Plaintiff's prognosis was treatable and the likelihood of
recovery was fair. (Id. at 367.) He further opined Plaintiff's condition could
improve over the next twelve to twenty-four months with adequate medical care
and follow-up, enhanced psychosocial support and entrance into vocational
rehabilitation programs. (Id.)

Dr. Dolnak's functional assessment of Plaintiff included the following:

1. Plaintiff was able to understand, remember, and carry out simple one
   or two-step job instructions.

2. Plaintiff would have mild difficulty with detailed and complex

7

instructions secondary to mild difficulty with attention and concentration related to depression and anxiety.

3. Plaintiff was able to relate and interact with coworkers and the public.

4. Plaintiff would have some mild difficulty in her ability to maintain concentration and attention, persistence and pace.

5. Plaintiff was able to associate with day-to-day work activity, including attendance and safety.

6. Plaintiff was able to accept instructions from supervisors.

7. Plaintiff would have some difficulty in being able to perform work activities without special or additional supervision regarding occasional anxiety and depression related to prior history of trauma and difficulties with attention and concentration related to anxiety that would affect her ability to perform work activities on a very consistent basis.

8. Plaintiff was able to maintain regular attendance in the work place and complete a normal work day routine without any interruptions from any major psychiatric disorder at this time.

(Id. at 367.) Dr. Dolnak also reported Plaintiff was capable of handling funds. (Id.)

### C. **UCSD Health System (2013)**

On May 25, 2013 Plaintiff presented to UC San Diego Health System, Hillcrest Emergency for back pain after being hit in the back with a door at work. (Id. at 413, 419.) Dr. Lucia Modesti noted Plaintiff was dramatic during the interview, "often deranging from the answer," and made angry statements. (Id. at 421.) Dr. Modesti also noted Plaintiff could be redirected, but acted annoyed and had a demanding attitude. (Id.) Dr. Modesti further noted Plaintiff refused to see her after the initial evaluation and exam. (Id. at 422.)

8

### D.    Areta Crowell BPSR Center (2013)

On November 21, 2013, Plaintiff was assessed and admitted to the Areta Crowell BPSR Center.  (Id. at 438.)  At the time Plaintiff was admitted she was diagnosed with Major Depressive Disorder, Recurrent, Severe without Psychotic Features and Posttraumatic Stress Disorder.  (Id.)  Plaintiff was prescribed Remeron and Vistaril and was referred to community mental health outpatient services for follow-up.  (Id. at 441.)

#### a. December 2013

On December 3, 2013, Plaintiff presented to Dr. John Sullivan for medication management.  (Id. at 457.)  Plaintiff arrived in a good mood and was cooperative.  (Id.)  Dr. Sullivan reported Plaintiff described a history of sexual, physical, and emotional abuse and trauma which had affected her negatively in several aspects of her life, including her memory, mood, concentration, and sleep. (Id. at 455.)

Dr. Sullivan also reported Plaintiff described a history of substance abuse, but that she had been sober for the past year.  (Id.)  She denied a past history of mania or hypomania, and psychiatric admissions.  (Id.)  Plaintiff described one suicidal overdose on Vicodin in September 2013, but denied suicidal ideation since.  (Id.)  Plaintiff described a history of hearing voices when depressed or stressed, which had caused her to instigate fights when the voices told her to protect herself. (Id.)  She reported the voices had not commanded her to harm herself.  (Id.)

Dr. Sullivan's mental status exam noted Plaintiff was irritable and guarded, had an "irritated" mood, constricted affect, and linear thoughts, with denials of suicidal or homicidal ideation, or auditory or visual hallucinations.  (Id.)  Dr. Sullivan noted risk of suicide was low as Plaintiff was future-oriented and motivated to improve her mental health.  Dr. Sullivan advised Plaintiff to continue Remeron and Vistarol and also prescribed Abilify. (Id. at 456.)

### b. March 2014

On March 3, 2014, Plaintiff returned to Dr. Sullivan for medication management. (Id. at 466.) Dr. Sullivan reported Plaintiff discussed spending more time thinking about her trauma, which became worse with triggers. (Id. at 464.) Plaintiff also described poor concentration, sad mood, feelings of being watched, and visual hallucinations of shadows in her room. (Id.)

Dr. Sullivan's report regarding Plaintiff's history mirrors his December 2013 report summarized above. Dr. Sullivan's mental status exam observations were similar to the December report and indicated Plaintiff was guarded and anxious with a constricted affect and linear thoughts, and she denied any suicidal or homicidal ideations or auditory and visual hallucinations. (Id.) Dr. Sullivan also noted paranoia. (Id.) Dr. Sullivan advised Plaintiff to continue taking Abilify, Remeron and Vistaril and prescribed Zoloft. (Id. at 465.)

The same day, and at Dr. Sullivan's request, Plaintiff was also seen by therapist Matthew Holley. (Id. at 467.) Mr. Holley observed Plaintiff to be somewhat disheveled, slumped in the chair, and at times was minimally verbal with little eye contact. (Id.) He reported the therapeutic intervention consisted of empathetic and reflective listening, assessment for safety, and assistance with identifying steps to reduce stressors. (Id.) Plaintiff informed Mr. Holley she was feeling stressed about housing and not being able to find a job, and said she wanted to find both a job and apartment. (Id.) She said she had experienced suicidal ideation, but denied plan or intent. (Id.) She stated she spent a lot of time in bed, had low motivation, and was worried about her future, but was taking her medications. (Id.)

On March 5, 2014, Plaintiff returned to Mr. Holley for follow-up. (Id. at 469.) Mr. Holley reported Plaintiff was well-groomed and had a depressed mood and blunted affect. (Id.) Plaintiff reported she had been up since five o'clock in the morning and was "done with sleep" because she had slept a lot over the past few

days.  (Id.)  Mr. Holley also reported Plaintiff seemed suddenly motivated to apply to several jobs.  (Id.)  Plaintiff was focused on problem-solving her upcoming need for housing and verbalized many ideas.  (Id.)  Mr. Holley's therapeutic intervention consisted of exploring Plaintiff's previous homicidal ideations and assessed current risk.  (Id.)  Mr. Holley also assisted Plaintiff with identifying next steps towards finding a job and re-framing stressors as goals, and gave her positive feedback regarding her focus on problem-solving.  (Id.)

### c. April 2014

On April 1, 2014, Plaintiff returned to Dr. Sullivan for medication management.  (Id. at 473-475.)  Dr. Sullivan reported Plaintiff had a history of bipolar with psychotic features and post-traumatic stress disorder.  (Id. at 473.) Plaintiff described experiencing:  oversleeping, social isolation, nightmares, poor concentration, periods of mania with increased energy, decreased need for sleep, racing thoughts, impulsivity, and going many days without sleeping.  (Id.) Dr. Sullivan's report also included the same history notes as the December and March reports described above.  (Id.)

Dr. Sullivan indicated Plaintiff had a guarded "up and down" mood, constricted affect and linear thoughts. (Id.)  She denied having suicidal or homicidal ideations or auditory or visual hallucinations.  (Id.)  Plaintiff was again prescribed Abilify, Remeron, Vistaril, and Zoloft.  (Id. at 475.)

On the same day Dr. Sullivan completed a Mental Impairment Residual Function Capacity Questionnaire at the request of Plaintiff's representative.  (Id. at 472, 445-49.)  Dr. Sullivan reported Plaintiff's bipolar mood fluctuation impaired her focusing, concentration, and organization and that Plaintiff was unable to maintain minimum concentration to complete tasks.  (Id. at 447.)  Dr. Sullivan opined Plaintiff had "no useful ability to function" with respect to the following:  to understand and remember short and simple instructions; carry out short and simple instructions; complete a normal workday and workweek without

16-cv-01048-CAB (JMA)

interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; deal with normal work stress; understand and remember detailed instructions; carry out detailed instructions; and deal with stress of semiskilled and skilled work. (Id. at 447-48.) Additionally, Dr. Sullivan opined Plaintiff was "unable to meet competitive standards" with respect to the following: maintaining regular attendance and being punctual within customary, usual strict tolerances; maintaining attention for two hour segments; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without causing them undue distraction or exhibiting behavioral extremes; and using public transportation because her PTSD is triggered in this setting. (Id.) Dr. Sullivan concluded Plaintiff's impairments or treatment would cause her to miss more than four days of work per month, with impairments expected to last at least twelve months. (Id. at 449.)

## III.  THE ADMINISTRATIVE HEARING

The ALJ conducted an administrative hearing on July 8, 2014. (Id. at 68.)

### A.  **Plaintiff's Testimony**

Plaintiff's attorney suggested Plaintiff met Section 12.04 of the disability listings[2]. (Id. at 70.)  The ALJ began by questioning Plaintiff's work experience. (Id.)  Plaintiff testified she presently worked for In-Home Support Services ("IHSS") through San Diego State University.  (Id.)  In the course of this employment, Plaintiff went to an autistic female adult's house to sweep, prepare meals, and write in a journal documenting the client's behavior.  (Id. at 71, 72). At the time of the hearing Plaintiff had been employed for three months, receiving

---

[2] Section 12.04 of the Social Security disability listings pertains to Depressive, Bipolar, and related disorders.

$10.00 an hour and working twenty hours per week.  (Id. at 71).  Plaintiff indicated she had asked to work more, but her boss would not give her more hours.  (Id. at 78.)  Plaintiff also testified her schedule did not change week to week, but she had stayed for one overnight shift.  (Id. at 73, 76.)  Plaintiff testified she obtained the job after talking with someone about her problems and the person thought the job would help with her depression.  (Id. at 72.)  Plaintiff testified her training for the job consisted of visiting the house with another person to observe how to keep a journal and talk with the client, and watching a video about the program.  (Id. at 73, 91).

Plaintiff testified she slept most of the time during her shift.  (Id. at 73.)  Plaintiff indicated she used to drive the client around to shop, but her shift was changed so she did not have to drive.  (Id. at 74.)  Plaintiff speculated this was due to her poor driving record.  (Id.)  Plaintiff also indicated she attended the fair with the client and the client's father to help the client with the restroom, but any outing required supervision because she would likely not be able to handle the client alone.  (Id. at 75.)  Plaintiff indicated she completed a journal entry once per day at the end of her shift which consisted of answering specific questions about the client's diet, interactions, verbal arguments, and any time the client spent alone.  (Id. at 78-79.)  Plaintiff indicated at times she became annoyed or mad and had to walk away for a few minutes.  (Id. at 79).

Plaintiff testified her boss recently visited during a shift and asked the client about Plaintiff's behavior and whether Plaintiff was capable of working.  (Id. at 77.)  Plaintiff stated the client told her boss Plaintiff needed more patience and Plaintiff slept a lot.  (Id.)

Prior to Plaintiff's current employment, Plaintiff worked at Jack in the Box for one month in the year 2013, but sustained a back injury, resulting in a $5,000.00 worker's compensation claim.  (Id. at 80-82.)  The ALJ noted two reported jobs:  Jamba Juice and Sutherland Management.  (Id. at 81).  Plaintiff

16-cv-01048-CAB (JMA)

testified the longest she had held a job was three months before getting fired. (Id. at 80.)  Plaintiff also testified when she had a job she always had problems: that she does not know how to feel, "freaks out", cries, becomes emotional if someone says something nice, and wants to sleep and do nothing.  (Id. at 86.)

Plaintiff testified she received her GED in the year 2008.  (Id. at 83.)  She indicated she spent her time partying and couch surfing around San Diego County the next four years and did not live at home.  (Id.)  Plaintiff thought she might have applied for work during that time, but her "mind wasn't really there much."  (Id.)

Plaintiff testified she took three medications to help with sleep, anxiety and depression.  (Id. at 84.)  The medications helped, but she said she still experienced symptoms.  (Id.)

Plaintiff testified during a typical bad day she does not want to do anything and her mood is mad and sad.  (Id. at 84.)  She indicated she has more bad days than good days and has difficulty being around people.  (Id.)  She also indicated she has been told that her mood can change quickly.  (Id.)  Plaintiff testified she spent her time sleeping, reading, and going to the doctor once a month.  (Id. at 85.)  Plaintiff further testified she had pain everywhere, specifically in her legs, feet, and back.  (Id.)  Plaintiff also indicated she has been sober for eighteen months.  (Id.)  At the time of the hearing, Plaintiff lived with her grandparents, and indicated there were some scary nights.  (Id. at 85, 86.)  Prior to living with her grandparents, Plaintiff lived at a center that helps the homeless.  (Id. at 87.)

The ALJ determined Plaintiff did not have any documented past work experience based on Plaintiff's limited past part-time work.  (Id. at 91)

/ /

/ /

/ /

/ /

## IV. THE ALJ'S DECISION

After considering the record, ALJ Iafe made the following findings:

. . . .

2. The claimant has the following severe impairments: depressive disorder NOS and post-traumatic stress disorder [citation omitted].

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [the Social Security regulations].

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out simple instructions for simple and repetitive tasks.

5. The claimant has no past relevant work [citation omitted].

….

8. The claimant has no transferable job because she has no past relevant work [citation omitted].

9. Considering the claimant's age, education, work experience, and residual function capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform [citation omitted].

9. The claimant has not been under a disability, as defined in the Social Security Act, since May 25, 2012, the date the application was filed [citation omitted].

(Id. at 39-44.)

16-cv-01048-CAB (JMA)

## V.    STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show:  (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

### A.    Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are as follows:  (1) Whether the claimant is presently working in any substantial gainful activity.  If so, the claimant is not disabled.  If not, the evaluation proceeds to step two.  (2) Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four.  (4) Whether the claimant is able to do any work (s)he has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled.  Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

### B. Judicial Review

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Id. at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may also be remanded to the SSA for further proceedings. Id.

## VI. DISCUSSION

Plaintiff argues the ALJ erred in granting little weight to the mental function opinions of Dr. Sullivan, her treating psychiatrist. (Pl.'s Mot. at 7-13.)

"In disability benefits cases . . . physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability–the

16-cv-01048-CAB (JMA)

claimant's ability to perform work." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). There are three types of physicians in such cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). When considering a disability claim, an ALJ evaluates the medical opinions in light of the evidentiary record as a whole. See 20 C.F.R. § 416.927(b). Generally, a treating physician's opinion is given more weight by the SSA than a nontreating physician's opinion. Lester, 81 F.3d at 830; see also 20 C.F.R. § 404.1527(c)(2).

When the treating physician's opinion is contradicted by another doctor, as is the case here, the ALJ may reject the opinion only by giving "specific and legitimate" reasons for doing so that are based on substantial evidence in the record. Lester, 81 F.3d at 830 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). This is the case because a treating physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." Garrison, 759 F.3d at 1012 (citing Orn v. Astrue, 495 F.3d 625, 633 (9th Cir. 2007)). "An ALJ can satisfy the 'substantial evidence' requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Garrison, 759 F.3d at 1012 (quotations and citation omitted). An ALJ commits error if he does not explicitly reject a medical opinion or set forth specific and legitimate reasons for crediting one medical opinion over another. Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996).

/ /

/ /

/ /

/ /

16-cv-01048-CAB (JMA)

Here, the ALJ noted Dr. Sullivan diagnosed Plaintiff with bipolar disorder with psychotic features and assigned a GAF score of 33.[3] (Id. at 42, 445.) He considered Dr. Sullivan's opinions that Plaintiff had "no useful ability to function" with respect to the aforementioned mental abilities and aptitudes; was "unable to meet competitive standards" with respect to the aforementioned mental abilities and aptitudes; and would be absent from work more than four days per month. (Id. at 42, 447-49.) The ALJ observed that Dr. Sullivan's conclusions regarding Plaintiff's limitations were based on the diagnosis of bipolar disorder with psychotic features, which "impair[s] her focusing, concentration, and organization," accompanied by racing thoughts, impulsivity, and concentration difficulties. (Id. at 42, 447-48.) The ALJ also noted Dr. Sullivan completed the mental impairment residual functional capacity form at the request of the Plaintiff's representative. (Id. at 42.)

The medical opinions of Dr. Sullivan were contradicted by examining psychiatrist, Dr. Dolnak, who determined Plaintiff had no more than a mild limit in any major mental functional domain. (Id. at 42-43, 334-35, 367.) In resolving Dr. Sullivan's and Dr. Dolnak's conflicting medical opinions, the ALJ summarized both professionals' observations, diagnosis, and assessment of Plaintiff's functional limitations, and determined the weight of the evidentiary record best comported with Dr. Dolnak's functional assessment. (Id. at 55-58.) The ALJ explained he gave Dr. Dolnak's opinions greater weight than those of Dr. Sullivan because Dr. Sullivan's assessment of Plaintiff's functional limitations: 1) is not supported by objective medical evidence; 2) is inconsistent with the opinions of Dr. Dolnak; and 3) is inconsistent with Plaintiff's daily activities and testimony.

---

[3] A GAF score between 31 and 40 suggests some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

16-cv-01048-CAB (JMA)

Plaintiff contends the reasons proffered are neither specific nor legitimate, and are not supported by substantial evidence in the record. The Court will address the ALJ's reasons for discounting Dr. Sullivan's opinions in turn.

**A.**     <u>**The ALJ Did Not Err In Concluding Dr. Sullivan's Functional Assessment Was Not Supported By Objective Clinical Findings**</u>

The ALJ stated he gave "little weight" to the medical opinions of Dr. Sullivan in part because the functional limits described by Dr. Sullivan were not supported by objective findings from mental health treating sources. (<u>Id.</u> at 42.) <u>See</u> 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the state agency or Social Security Administration] will give that opinion.) <u>See also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002). ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.")

Dr. Sullivan's opinions regarding Plaintiff's functional limits were set forth on a questionnaire form that largely consists of check-the-box style responses. (Admin R. at 445-449.) <u>See</u> <u>Crane v. Shalala</u>, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected psychological evaluations as they were check-off reports that did not contain any explanation of the bases of their conclusions.) Dr. Sullivan opined his assessment of Plaintiff's functional limitation is due to bipolar disorder. (Admin. R. at 447.) His assessment, however, is inconsistent with his treatment notes and other records from Areta Crowell BPSR Center, which the ALJ observed did not indicate clinical signs and symptoms of a bipolar disorder. (<u>Id.</u> at 42.) These records, as the ALJ properly describes, notate Plaintiff's variable mood and constricted affect, but mostly contain reports of

Plaintiff's subjective complaints, a source the ALJ determined not to be credible.[4] (Id. at 41-42, 455, 464, 473.)

Plaintiff takes issue with the ALJ's determination, pointing to records of a visit she made to Areta Crowell BPSR Center on December 3, 2013, as evidence of a bipolar disorder. (Pl. Mot. at 9.) On that date, Dr. Sullivan observed Plaintiff's mood to be irritable, guarded and constricted, whereas Licensed Vocation Nurse Julie Allen observed Plaintiff to be "in a good mood and cooperative." (Admin. R. at 455 and 457.) The weight of the medical evidence, however, does not support Dr. Sullivan's diagnosis of bipolar disorder with psychotic features or his assessment of Plaintiff's functional limitations. When Plaintiff was first assessed and admitted to the Areta Crowell BPSR Center, her diagnosis was Recurrent Severe Major Depressive Disorder, without Psychotic Features and Posttraumatic Stress Disorder. (Id. at 438.) Thereafter, Dr. Sullivan twice reported that Plaintiff denied having a history of mania or hypomania[5] (Id. at 455 & 464) and for all three examinations, he reported Plaintiff had linear thinking without auditory or visual hallucinations (Id. at 42, 455, 464, 473-474.). See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (finding that the discrepancy between the treating physician's recorded observations and statement was a clear and convincing reason for not relying on an uncontradicted opinion.) As the ALJ noted, the treating records did not contain evidence of psychotic features such as abnormalities of thought content and processes, and Dr. Sullivan's mental status examinations were unremarkable other than irritable mood, variable mood, and

---

[4] Plaintiff does not challenge the ALJ's finding that she was not a reliable source for information.

[5] Plaintiff also denied experiencing severe symptoms for mania, bipolar disorder or psychosis when examined by Dr. Dolnak. (Admin. R. 365.)

16-cv-01048-CAB (JMA)

constricted affect.[6]  (Id. at 42, 455, 473.)  In sum, Dr. Sullivan's narrow clinical findings of variable mood and constricted affect, coupled with the lack of psychotic evidence and inconsistencies between his treating records and opinions, do not support a determination of the severe functional limitations indicated on the questionnaire form.

### B. The ALJ Did Not Err In Giving Less Weight To Dr. Sullivan's Functional Assessment Because It Was Inconsistent With Dr. Dolnak's Clinical Findings

The ALJ also rejected Dr. Sullivan's opinion regarding Plaintiff's functional limits because it was inconsistent with the clinical findings reported by examining psychiatrist Dr. Dolnak, who found no significant cognitive defects.  (Admin R. at 42, 366).  Plaintiff argues Dr. Dolnak's assessment does not constitute substantial evidence because he only reviewed SSA form 3368 and his assessment was made without the benefit of Dr. Sullivan's records and opinion and, thus, was not based on a complete medical assumption.[7] [8] (Pl's Mot. at 10.)  In addition to reviewing SSA form 3368, however, Dr. Dolnak performed a comprehensive psychiatric evaluation of Plaintiff and, thus, is an "examining physician" whose opinion constitutes substantial evidence when it rests on the his own independent examination of the claimant.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  Here, Dr. Dolnak based his opinion on

---

[6]  Although, as Plaintiff points out, the ALJ did not address Dr. Sullivan's observation of paranoia made during one of Plaintiff's mental status examinations (Admin R. at 464), this notation of paranoia does not alone justify the severe functional limitations assigned by Dr. Sullivan, and which Dr. Sullivan attributed to a bipolar disorder diagnosis.

[7] Dr. Dolnak's assessment was made more than one year prior to Plaintiff's visits with Dr. Sullivan so records of Dr. Sullivan's observations, opinions and treatment did not yet exist at the time Dr. Dolnak's report was made.  (Admin. R. at 363, 455.)

[8]  Plaintiff also contends the ALJ failed to discuss "obvious inconsistencies" between Dr. Dolnak's mental examination and his assessed limitations, but does not identify any such inconsistencies.  (Pl's Mot. at 11.)

16-cv-01048-CAB (JMA)

observations and responses by Plaintiff to various clinical tests such as serial sevens and twos, and spelling and digit span testing and, as the ALJ correctly noted, found no significant cognitive deficits. (Admin R. at 42, 366.) Furthermore, as the ALJ also observed, Dr. Dolnak's findings of only mild limitations is consistent with his own mental status examination, the clinical findings of Dr. Nicholson, who also examined Plaintiff, as well as the treatment notes of Dr. Sullivan and the Areta Crowell BPSR Center. (Id. at 43, 365-67, 455, 464, 473.)

### C. The ALJ Did Not Err In Concluding Dr. Sullivan's Functional Assessment Was Not Supported By Plaintiff's Testimony And Daily Activities

Lastly, Plaintiff contends the ALJ erred in discounting Dr. Sullivan's opinion on the basis his findings are undermined by Plaintiff's daily activities, problem solving skills, and testimony regarding her employment. (Pl. Mot. at 11-12.) In analyzing an individual's overall well-being, the ALJ may consider Plaintiff's daily activities, treating therapist notes, and evidence suggesting she has responded well to treatment. Crane, 76 F.3d at 254. Here, the ALJ explained he also rejected Dr. Sullivan's opinion based on Plaintiff's active search for employment, her ability to engage in problem solving and coping skills, and her testimony about her ability to perform the IHSS duties for an autistic client, which she had been doing for about 20 hours per week for three months. (Admin R. at 42.)

First, Plaintiff argues the ALJ erroneously relied on Plaintiff's statement "she would like to find a job" as evidence that Plaintiff was actively searching for employment. (Pl's. Mot. at 11, citing to Admin. R. at 467.) Plaintiff incorrectly contends "(t)he ALJ's citation to the record does not demonstrate active search for employment" and that Plaintiff simply reported to her therapist that she would like to find a job, not that she had been actively searching for one. (Id.) In fact, the record indicates on March 3, 2014, Plaintiff reported "she had not been able

to find a job despite applying for several" and two days later she stated there were three jobs she would apply for that day and she would also inquire about getting her previous job back. (Admin. R. at 467 and 469.)

Plaintiff also takes issue with the ALJ's consideration of Plaintiff's use of problem solving skills she learned through treatment at the Areta Crowell BPSR Center. (Pl. Mot. at 12.) Records of her therapy show Plaintiff's psychotherapist, Matthew Holley, worked with Plaintiff to develop problem solving and coping skills as a means of managing her stressors. (Admin. R. at 467-470.) On March 5, 2014, he evaluated her progress and reported Plaintiff was "engaging her problems to solve them and keep them from becoming bigger stressors for her." (Id. at 469.) He further reported she was "engaging in mental health treatment to assist her in navigating stressors and using coping skills" and that Plaintiff "agreed that her current problems are able to be solved, she just needs to remain focused and motivated." (Id.) These observations are at odds with Dr. Sullivan's opinion regarding Plaintiff's functional limitations and it was not error for the ALJ to consider them. See Crane, 76 F.3d at 254.

Lastly, Plaintiff contends the ALJ erred in considering Plaintiff's testimony about her IHSS employment as a basis for discounting Dr. Sullivan's opinions. The ALJ considered Plaintiff's ability to perform IHSS duties for an autistic client 20 hours per week for three months. (Admin. R. at 42.) As part of her duties, Plaintiff cleaned, prepared meals, and maintained a journal documenting the client's conduct and demeanor. (Id. at 70-73.) Plaintiff wrote in the journal daily, at the end of each shift, and answered questions such as what the client ate, any interactions with others, any verbal arguments, or any time the client spent alone. (Id. at 78-80.) The ALJ's determination that Plaintiff's self-reported duties are inconsistent with Dr. Sullivan's assessment of "no useful ability to function" in being able to understand, remember, and carry out short and simple instructions is, thus, supported by substantial evidence. (Id. at 447.)

## VII. CONCLUSION

For the reasons set forth above, the Court concludes, after a thorough review of the record as a whole, the ALJ's evaluation of the medical evidence and finding that Plaintiff is not disabled is not based on legal error and is supported by substantial evidence. The Court recommends Plaintiff's motion for summary judgment be **DENIED** and Defendant's cross-motion for summary judgment is **GRANTED**.

This report and recommendation will be submitted to the Honorable Cathy A. Bencivengo, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **July 24, 2017**. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before **July 31, 2017**. The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 7, 2017

**IT IS SO ORDERED.**

Dated: July 7, 2017

Honorable Jan M. Adler
United States Magistrate Judge

16-cv-01048-CAB (JMA)